IN THE SUPREME COURT OF NORTH CAROLINA

2022-NCSC-22

No. 436PA13-4

Filed 11 March 2022

I. BEVERLY LAKE, JOHN B. LEWIS, JR., EVERETTE M. LATTA, PORTER L.
McATEER, ELIZABETH S. McATEER, ROBERT C. HANES, BLAIR J.
CARPENTER, MARILYN L. FUTRELLE, FRANKLIN E. DAVIS, ESTATE OF
JAMES D. WILSON, ESTATE OF BENJAMIN E. FOUNTAIN, JR., FAYE IRIS
Y. FISHER, STEVE FRED BLANTON, HERBERT W. COOPER, ROBERT C.
HAYES, JR., STEPHEN B. JONES, MARCELLUS BUCHANAN, DAVID B.
BARNES, BARBARA J. CURRIE, CONNIE SAVELL, ROBERT B. KAISER,
JOAN ATWELL, ALICE P. NOBLES, BRUCE B. JARVIS, ROXANNA J. EVANS,
JEAN C. NARRON, and all others similarly situated

v.

STATE HEALTH PLAN FOR TEACHERS AND STATE EMPLOYEES, a
corporation, formerly known as the North Carolina Teachers and State
Employees' Comprehensive Major Medical Plan, TEACHERS' AND STATE
EMPLOYEES' RETIREMENT SYSTEM OF NORTH CAROLINA, a corporation,
BOARD OF TRUSTEES of the TEACHERS' AND STATE EMPLOYEES'
RETIREMENT SYSTEM OF NORTH CAROLINA, a body politic and corporate,
DALE R. FOLWELL, in his official capacity as Treasurer of the State of North
Carolina, and the STATE OF NORTH CAROLINA

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision

of the Court of Appeals, 264 N.C. App. 174 (2019), reversing and remanding an order

of summary judgment entered on 19 May 2017 by Judge Edwin G. Wilson, Jr. in

Superior Court, Gaston County. Heard in the Supreme Court on 4 October 2021.

*Gray, Layton, Kersh, Solomon, Furr & Smith, P.A. by Michael L. Carpenter,
Christopher M. Whelchel, Marcus R. Carpenter, and Marshall P. Walker; Tin,
Fulton, Walker & Owen, PLLC, by Sam McGee; and The Law Office of James
Scott Farrin, by Gary W. Jackson and J. Bryan Boyd, for plaintiff-appellants.*

*Joshua H. Stein, Attorney General, by Ryan Y. Park, Solicitor General, and Marc Bernstein, Special Deputy Attorney General, for defendant-appellees.*

*The McGuinness Law Firm, by J. Michael McGuinness; and North Carolina Association of Educators, by Verlyn Chesson Porte, for amicus curiae North Carolina Association of Educators.*

*The Sumwalt Group, by Vernon Sumwalt; and AARP Foundation, by Ali Naini, for amicus curiae AARP and AARP Foundation.*

EARLS, Justice.

¶ 1      In this case, a class of more than 220,000 former State employees (the Retirees) sued the State of North Carolina and various officials and agencies (the State) after the General Assembly enacted a statute that eliminated their option to remain enrolled in a premium-free preferred provider organization health insurance plan which allocated eighty percent of the costs of health care services to the insurer and twenty percent to the insured (the 80/20 PPO Plan). According to the Retirees, the State had undertaken a contractual—and thus constitutional—obligation to provide them with the option to remain enrolled in the 80/20 PPO Plan or one of equivalent value, on a noncontributory basis, for life. In response, the State argues that it never promised the Retirees the benefit of lifetime enrollment in any particular premium-free health insurance plan and that, even if it had done so, the noncontributory plan the State continues to offer provides the Retirees with a benefit of the same or greater value than the one available to them prior to 2011, when the statute eliminating the noncontributory 80/20 PPO Plan option was enacted (the 2011 Act).

The trial court agreed with the Retirees and entered partial summary judgement in their favor. A unanimous panel of the Court of Appeals reversed and remanded for entry of summary judgment in favor of the State. *See Lake v. State Health Plan for Tchrs. & State Emps.*, 264 N.C. App. 174, 189 (2019). On discretionary review before this Court, we must answer a threshold question that divided the lower tribunals and which the parties vigorously contest: Did the State assume a contractual obligation to provide the Retirees the benefit of lifetime enrollment in the premium-free 80/20 PPO Plan or its substantive equivalent, such that the Retirees possessed a constitutionally protected vested right?

This Court has stated and reaffirmed that "[a] public employee has a right to expect that the retirement rights bargained for in exchange for his loyalty and continued services, and continually promised him over many years, will not be removed or diminished." *Bailey v. State*, 348 N.C. 130, 141 (1998) (quoting *Simpson v. N.C. Local Gov't Emps.' Ret. Sys.*, 88 N.C. App. 218, 224 (1987), *aff'd per curiam*, 323 N.C. 362 (1988)). We have recognized that this right protects state employees' pensions and also encompasses other forms of benefits. *See, e.g., N.C. Ass'n of Educators v. State*, 368 N.C. 777 (2016) (*NCAE*) (holding that teachers possessed a protected right in their status as "career teachers"). It is understandable that the Retirees—who, before 2011, were eligible to remain enrolled in the 80/20 PPO Plan without paying a premium—would perceive being required to pay a premium to

remain enrolled in the 80/20 PPO Plan as diminishing their bargained-for rights. For the reasons explained below, we agree with the trial court that the Retirees enjoyed a constitutionally protected vested right in remaining enrolled in the 80/20 PPO Plan or its substantive equivalent on a noncontributory basis.

¶ 4        Nonetheless, the Retirees are entitled to receive only the benefit of the bargain they struck with the State and nothing more. To prevail on their claims arising under Article I, Section 10 of the United States Constitution (the Contracts Clause), the Retirees must also demonstrate that the General Assembly "substantially impaired" their contractual rights when it eliminated the option of enrolling in the premium-free 80/20 PPO Plan. *Bailey*, 348 N.C. at 151. And even if the Retirees meet this burden, the State must be afforded the opportunity to show that the impairment was "reasonable and necessary to serve an important public purpose" and was thus not in violation of the Contracts Clause. *Id.* at 141 (citing *U.S. Tr. Co. of N.Y. v. New Jersey* (*U.S. Trust*), 431 U.S. 1 (1977)).

¶ 5        These latter two questions—whether a contract has been "substantially impaired" and whether any such impairment is "reasonable and necessary"—are particularly fact-intensive. Answering them requires a careful examination of the plans made available to the Retirees when their respective rights to health insurance coverage vested and a comparison of those plans to the ones the State currently offers. Although the 2011 Act plainly requires the Retirees to pay a premium to remain

enrolled in a plan previously offered on a noncontributory basis, many variables besides a premium—such as the size of a plan member's deductibles and co-pays, and the scope of coverage the plan affords—affect the value of a health insurance plan. Furthermore, in a rapidly changing world of dramatic medical advances and evolutions in how health care is financed, including changes to the State's overall health insurance offerings that provide new options for retired state employees, it would be unreasonable to expect that the State would maintain the precise terms of the plans it offered in an entirely different era.

¶ 6       Accordingly, we hold that the trial court correctly determined there were no genuine issues of material fact relating to whether the Retirees possessed a vested right protected under the Contracts Clause. The trial court correctly concluded that the Retirees had obtained such a right. Therefore, the Court of Appeals erred in concluding that the Retirees possessed no vested rights within the meaning of the Contracts Clause. But numerous genuine issues of material fact needed to be resolved in order to answer the latter two questions—whether the 2011 Act worked a substantial impairment of the Retirees' vested rights and whether any such impairment was reasonable and necessary. Thus, the trial court erred in summarily concluding as a matter of law on the record before it that the General Assembly violated the Retirees' state or federal constitutional rights. Accordingly, we affirm the Court of Appeals' decision to reverse the trial court's grant of partial summary

judgment in favor of the Retirees, reverse the Court of Appeals' decision to remand this case for entry of summary judgment in favor of the State, and remand this matter to the trial court for further proceedings not inconsistent with this opinion, including our holding that the Retirees possess a vested right.

## I.    Background

### A. Health insurance benefits for retired state employees.

In 1972, the State of North Carolina began offering all state employees and retirees the opportunity to enroll in a health insurance plan. Act of July 20, 1971, ch. 1009, 1971 N.C. Sess. Laws 1588. Initially, the State provided coverage via group insurance contracts it purchased on its employees' behalf. *Id.* § 1 at 1588. In 1982 the General Assembly altered this approach when it established a "Comprehensive Major Medical Plan" offered directly by the State. Act of June 23, 1982, ch. 1398, § 6, 1981 N.C. Sess. Laws (Reg. Sess. 1982) 288, 289-311 (Establishing Act). The Establishing Act codified the Major Medical Plan's terms of coverage and provided that members would be "eligible for coverage under the Plan[ ] on a noncontributory basis." *Id.* at 295. The plan was to be overseen by a Board of Trustees housed within the Office of State Budget and Management, *id.* at 298 (enacting N.C.G.S. § 135-39 (1982)), who were directed to contract with and supervise an outside entity selected by the State Budget Officer to serve as the Plan Administrator, *id.* at 290-91 (enacting N.C.G.S. §§ 135-39.4 to -39.5A (1982)). A few years later, the General Assembly enacted

another statute providing that, going forward, retired employees would need to have been employed by the State for at least five years before becoming eligible to receive benefits under the Major Medical Plan. Act of Aug. 14, 1987, ch. 857, § 9, 1987 N.C. Sess. Laws 2098, 2101.

¶ 8        In 2005 the General Assembly enacted a law providing state employees and retirees with the option of enrolling in various PPO plans, while continuing to offer the option of enrolling in the Major Medical Plan. Act of Aug. 13, 2005, ch. 276 § 29.33(a), 2005 N.C. Sess. Laws 1003. The General Assembly also increased the eligibility requirements for new hires to participate in noncontributory retirement health insurance plans from five years of service to twenty years, although the change was only made applicable prospectively. S.L. 2006-174, § 1, 2005 N.C. Sess. Laws (Reg. Sess. 2006) 630, 630. Effective in 2008, the State discontinued the Major Medical Plan it had offered since 1982 and replaced it with a State Health Plan for Teachers and State Employees. Current Operations and Capital Improvements Appropriations Act of 2007, S.L. 2007-323, § 28.22A(a)-(b), 2007 N.C. Sess. Laws 616, 892. By this time, the State was also offering two premium-free PPO plans—the 80/20 PPO Plan[1] and a 70/30 PPO Plan.

---

[1] The Retirees refer to the Major Medical Plan as the "Regular State Health Plan" and contend that the premium-free 80/20 PPO Plan was its "continuation." Put another way, they argue that the State satisfied its obligation to offer a premium-free health insurance plan of equivalent value to the initial Major Medical Plan (or Regular State Health Plan) until the General Assembly eliminated the option of enrolling in the premium-free 80/20 PPO Plan.

¶ 9       In 2011, the General Assembly authorized the State Health Plan[2] to charge employees and retirees a monthly premium to enroll in the 80/20 PPO Plan. S.L. 2011-85, § 1.2(a), 2011 N.C. Sess. Laws 119, 120 (the 2011 Act). The General Assembly did not eliminate the option for retirees to enroll in a noncontributory health insurance plan—the State continued to offer retirees the option of participating in the premium-free 70/30 PPO Plan. However, retirees who had previously been enrolled in the premium-free 80/20 PPO Plan were required to either pay a premium to remain in their same plan or choose a different premium-free plan containing different terms and, the Retirees assert, offering a less valuable benefit. *See id.*

**B. Trial court proceedings.**

¶ 10      In response to the 2011 Act, the Retirees filed suit on behalf of themselves and all other similarly situated former state employees against the State Health Plan for Teachers and State Employees, the Teachers' and State Employees' Retirement System and its trustees, the State Treasurer, and the State of North Carolina. They alleged claims for breach of contract, unconstitutional impairment of contracts in violation of the Contracts Clause, and unconstitutional violation of their rights to due process and equal protection under article I, section 19 of the North Carolina

___

[2] The phrase "the State Health Plan" refers both to the package of health benefits offered to State employees and retirees and to the agency that manages those benefits. *See* N.C.G.S. § 135-48.1(14) (2021).

Constitution (the Law of the Land Clause). They sought (1) a writ of mandamus requiring the State to "reinstate and continue" the premium-free 80/20 PPO Plan for all class members, or a preliminary and permanent injunction requiring the same; (2) declaratory relief; and (3) the creation of a trust or common fund for the payment of damages. The State initially moved to dismiss the complaint on the basis of sovereign immunity. After the trial court denied that motion, the State appealed. The Court of Appeals affirmed, holding that the Retirees "sufficiently alleged a valid contract between them and the State in their complaint to waive the defense of sovereign immunity." *Lake v. State Health Plan for Tchrs. & State Emps.*, 234 N.C. App. 368, 375 (2014).

On remand, the trial court certified a class composed of:

> (1) All members (or their Estates or personal representatives if they have deceased since July 1, 2009) of the N.C. Teachers' and State Employees' Retirement System ("TSERS") who retired before January 1, 1988; (2) TSERS members (or their Estates or personal representatives if they have deceased since July 1, 2009) who retired on or after January 1, 1988, were hired before October 1, 2006 and have 5 or more years of contributory service with the State and (3) surviving spouses (or their Estates or personal representatives if they have deceased since July 1, 2009) of (i) deceased retired employees, provided the death of the former plan member occurred prior to October 1, 1986; and (ii) deceased teachers, State employees, and members of the General Assembly who are receiving a survivor's alternate benefit under any of the State-supported retirement programs, provided the death of the former plan member occurred prior to October 1, 1986

All class members were either former employees who had become eligible to enroll in a premium-free State health insurance plan upon retirement because they satisfied the eligibility requirements in existence when they were hired or those deceased employees' beneficiaries.[3] The parties proceeded to discovery.

On 14 September 2016, the Retirees filed a motion for partial summary judgment. They alleged that "[t]he [State's] own documents and testimony prove that they offered the Retiree Health Benefit as a lifetime contractual benefit 'earned' through a defined period of employment service." In support of their motion, the Retirees relied on depositions of class members as well as former State benefits counselors, the Executive Director and Deputy Director for the State Health Plan, the Director of the Fiscal Research Division of the North Carolina General Assembly and its pension analyst, the Deputy Director of Operations for the State Retirement System, actuaries for the State Health Plan, a representative of the health insurance plan administrator (Blue Cross Blue Shield of North Carolina), and the then-serving elected North Carolina State Treasurer. They also relied on statements in legislation governing the State Health Plan, press releases pertaining to the State Health Plan,

---

[3] Notably, the class only includes retirees who would have satisfied the eligibility requirements for enrolling in the premium-free Major Medical Plan or subsequent 80/20 PPO Plan prior to the 2011 Act taking effect. This case only addresses changes applied retroactively to the health insurance options available to retirees already eligible to enroll in the plan the 2011 Act eliminated. The Retirees do not challenge the State's authority to change its employment benefit offerings prospectively.

training manuals used by customer service personnel to advise State employees and retirees, benefits handbooks provided to State employees and retirees, and presentations regarding the State Health Plan's fiscal outlook.

¶ 13      The undisputed evidence elicited from these sources and presented in support of the Retirees' summary judgment motion included descriptions of retirement health insurance coverage as a part of their "total package of compensation"; explanations that employees would become eligible for "noncontributory (no cost to you)" health insurance coverage upon retirement and "for life" after working for the State for at least five years; statements that employees would be eligible for retiree health coverage "for life" when they "vested"; descriptions of the State's "liability" arising from its ongoing "obligation" to continue paying the premiums for retirees who had "already earned" the right to enroll in the State Health Plan on a noncontributory basis; and class members' own statements that they relied on the promise of lifetime enrollment in a premium-free health insurance plan when deciding to accept or continue in employment with the State.

¶ 14      In response, the State filed its own motion for summary judgment as to liability in which it argued that the evidence presented by the Retirees demonstrated that "[t]he State never undertook, nor was any state agency authorized, to offer Plaintiffs any such contracts. . . . that would lock-in any terms of the [State Health] Plan for fifty-plus years into the future." The State further contended that even if the Retirees

had established the existence of some contractual right to remain enrolled in a health insurance plan of a particular value, the Retirees' assertion that the premium-free 70/30 PPO Plan was substantially less valuable than the premium-free 80/20 PPO Plan "fail[ed] to address the terms of a complete and enforceable contract for healthcare benefits," given that "[c]oinsurance is one of many healthcare terms and it accounts for only a fraction of healthcare costs."

¶ 15        On 19 May 2017, the trial court entered an Order Granting Plaintiffs' Motion for Partial Summary Judgment and Denying Defendants' Motion for Summary Judgment as to Liability. The trial court found as a factual matter that the State had promised its employees the benefit of enrolling in a plan at least as valuable as the premium-free 80/20 PPO Plan as part of their overall compensation package, that these employees relied on this promise, and that the promised benefit formed "a part of the contract between Class Members and the Defendants." Accordingly, the trial court determined that the Retirees' employment contracts with the State gave rise to "an entitlement to a non-contributory (premium-free) health plan equivalent to the 80/20 regular state health plan that had long been offered and provided to Class Members." The trial court further concluded that the 2011 Act eliminating the premium-free 80/20 PPO Plan "substantially impaired the[se] contracts" because the only noncontributory option thereafter available to the Retirees was the 70/30 PPO Plan. Finally, the court concluded that the State's action "was neither reasonable nor

necessary to serve an important public purpose." As a result, the trial court concluded that the 2011 Act violated both the federal Contracts Clause and the state Law of the Land Clause. The State again appealed.

**C. The Court of Appeals' decision.**

On appeal, the Court of Appeals unanimously reversed and remanded for the entry of summary judgment in favor of the State. *Lake v. State Health Plan for Tchrs. & State Emps.*, 264 N.C. App. 174 (2019).

The Court of Appeals began with the Retirees' claim that the 2011 Act violated the Contracts Clause, which provides in relevant part that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. art. I, § 10. According to the Court of Appeals, Contracts Clause claims are governed by a three-part test articulated by the United States Supreme Court in *United States Trust Co. of New York v. New Jersey* (*U.S. Trust*), 431 U.S. 1 (1977), and subsequently adopted by this Court. Under the *U.S. Trust* test, a court must "ascertain: (1) whether a contractual obligation is present, (2) whether the state's actions impaired that contract, and (3) whether the impairment was reasonable and necessary to serve an important public purpose." *Lake*, 264 N.C. App. at 179–80 (quoting *Bailey*, 348 N.C. at 141). The Court of Appeals concluded that the Retirees' claims failed the first prong of the *U.S. Trust* test: they could not demonstrate that the State had undertaken a "specific contractual financial obligation" to continue providing the 80/20 PPO Plan on a

noncontributory basis. *Id.* at 189.

¶ 18 To determine if any contractual right existed, the Court of Appeals compared the Retirees' asserted right to health insurance coverage with the pension benefits this Court held protected by the Contracts Clause in *Bailey*. According to the Court of Appeals, pension benefits were granted the status of a constitutionally protected "vested contractual right because they were a form of 'deferred compensation.' " *Id.* at 181 (quoting *Bailey*, 348 N.C. at 141). By contrast, the "benefit" of being eligible to enroll in a particular health insurance plan was categorically different. Whereas pension benefits are funded through "mandatory" deductions "from the employee's paycheck" and are "calculated based upon the employee's salary and length of service," state employees "are not required to" contribute anything to become eligible to enroll in a premium-free health insurance plan. *Id.* at 182. Additionally, "the level of retirement health care benefits is not dependent upon an employee's position, retirement plan, salary, or length of service. All eligible participants, active and retired, have equal access to the same choices in health care plans." *Id.* Thus, health insurance benefits and pension benefits are "[n]ot [a]nalogous." *Id.* at 181.

¶ 19 The Court of Appeals next examined the statutes governing the State Health Plan to determine if the General Assembly had evinced an express intent to undertake a contractual obligation. The Court of Appeals noted that "[t]he statutes governing the State Health Plan do not refer to a 'contract' between the employees

and the State," even though "[t]he term 'contract' *is* used in the statute to describe the relationship between the State Health Plan and its service providers." *Id.* at 185. Moreover, the Court of Appeals found it salient that the General Assembly had, on numerous occasions, exercised its statutorily reserved right to "alter" the State Health Plan by changing its terms, which the court concluded "support[s] a holding that the establishment and maintenance of the North Carolina State Health Plan is a legislative policy, which is 'expressly and, inherently subject to revision and repeal' by the General Assembly." *Id.* at 187 (quoting *Nat'l R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 466 (1985)). The Court of Appeals concluded that the Retirees had failed to overcome the "presumption" against construing statutes "to create contractual rights in the absence of an expression of unequivocal intent." *Id.* at 180–81.

The Court of Appeals also rejected the Retirees' effort to prove the State's intent to contract by looking to statements in "pamphlets, distributed by the State to its employees to explain the retirement benefits." *Id.* at 185. The Court of Appeals stated that this kind of extrinsic evidence was relevant only in cases involving "mandatory and contributory retirement benefits." *Id.* It reasoned that the General Assembly's "use of contractual language in the statute in reference to service providers indicates the General Assembly specified situations and knew when to use the word 'contract,' and it did not intend to form a contractual relationship between

the State and its employees related to health care insurance benefits." *Id.* at 186.

¶ 21    Having concluded that the Retirees had failed to demonstrate the existence of any vested right in a premium-free 80/20 PPO Plan or its substantive equivalent, the Court of Appeals determined that the Retirees' Contracts Clause argument necessarily failed. *Id.* at 188. For the same reason, the Court of Appeals overruled the trial court's conclusion that the 2011 Act "violated Article I, section 19 of the Constitution [by] tak[ing] Plaintiffs' private property without just compensation. . . . Without a valid contract, Plaintiffs' state constitutional claims also fail." *Id.* (citing *Adams v. State*, 248 N.C. App. 463, 469–70 (2016), *disc. rev. denied*, 370 N.C. 80 (2017)). Accordingly, the court "reverse[d] the grant of partial summary judgment and remand[ed] for entry of summary judgment in favor of Defendants and dismissal of Plaintiffs' complaint." *Id.* at 189.

¶ 22    Plaintiffs filed a Petition for Discretionary Review and Writ of Certiorari on 9 April 2019. This Court allowed discretionary review in an order dated 26 February 2020.[4]

---

[4] By order dated 18 August 2021 this Court, mindful of the quorum requirement of N.C.G.S. § 7A-10(a), invoked the Rule of Necessity to decide this matter in light of the fact that a majority of the members of the Court have one or more persons within the third degree of kinship by blood or marriage not residing in their households who could be plaintiff class members. *See, e.g., Boyce & Isley, PLLC v. Cooper*, 357 N.C. 655, 655–56 (2003) (invoking the Rule of Necessity to permit the making of a decision to grant or deny a petition for discretionary review in an important case by more than a bare quorum of the Court); *Long v. Watts,* 183 N.C. 99, 102–03 (1922) (determining that the Court must hear a case challenging the application of a statewide income tax to judicial salaries despite the potential effect of that case upon the members of the Court).

## II.    Standard of Review

"When the party bringing the cause of action moves for summary judgment, he must establish that all of the facts on all of the essential elements of his claim are in his favor. . . ." *Steel Creek Dev. Corp. v. James*, 300 N.C. 631, 637 (1980). The movant "must show that there are no genuine issues of fact; that there are no gaps in his proof; that no inferences inconsistent with his recovery arise from his evidence; and that there is no standard that must be applied to the facts by the jury." *Kidd v. Early*, 289 N.C. 343, 370 (1976). This Court reviews a grant of summary judgment de novo. *Charlotte-Mecklenburg Hosp. Auth. v. Talford*, 366 N.C. 43, 47 (2012). In undertaking de novo review, we consider the affidavits, depositions, exhibits, and other submissions of the parties to determine if the material facts are uncontested and whether there is a genuine issue for trial. *See, e.g.*, *Dobson v. Harris,* 352 N.C. 77, 83 (2000) (citing *Koontz v. City of Winston-Salem,* 280 N.C. 513, 518 (1972)).

In this case both parties moved for summary judgment on the merits. Nevertheless, as we explained in *Dobson*,

> [s]ummary judgment is properly granted when the forecast of evidence reveals no genuine issue as to any material fact, and when the moving party is entitled to a judgment as a matter of law. . . . The movant's papers are carefully scrutinized . . . those of the adverse party are indulgently regarded. All facts asserted by the adverse party are taken as true, and their inferences must be viewed in the light most favorable to that party.

352 N.C. at 83 (cleaned up). Thus, even though both parties in this case asserted that

there were no disputes of material fact and that they were entitled to judgment as a matter of law, if our review of the evidence submitted at summary judgment reveals a genuine material factual dispute, we must remand to the trial court. *See Forbis v. Neal*, 361 N.C. 519, 530–31 (2007) (remanding after review of cross-motions for summary judgment).

### III.  The Federal Contracts Clause Claim

The Court of Appeals correctly stated the legal framework applicable to claims arising under the Contracts Clause of the United States Constitution. As we have explained, when "determining whether a contractual right has been unconstitutionally impaired, we are guided by the three-part test set forth in *U.S. Trust Co. of N.Y. v. New Jersey*." *Bailey*, 348 N.C. at 140. This test requires us to "ascertain: (1) whether a contractual obligation is present, (2) whether the state's actions impaired that contract, and (3) whether the impairment was reasonable and necessary to serve an important public purpose." *Id.* at 141. An impairment only implicates the Contracts Clause if it is "substantial" as opposed to "[m]inimal." *Id.* at 151 (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244–45 (1978)). We apply this familiar "tripartite test" in analyzing the Retirees' claim. *Simpson v. N.C. Local Gov't Emps.' Ret. Sys.*, 88 N.C. App. 216, 224 (1987), *aff'd per curiam*, 323 N.C. 362 (1988).

**A. Relevant North Carolina precedents interpreting and applying the *U.S. Trust* test.**

¶ 26        This Court has interpreted and applied the *U.S. Trust* test to determine whether state employees or retirees possessed a vested right to an employment benefit on numerous occasions. At its core, this case centers on the proper interpretation of four of those cases: *Simpson v. North Carolina Local Government Employees' Retirement System*, 88 N.C. App. 218 (1987), *aff'd per curiam*, 323 N.C. 362 (1988); *Faulkenbury v. Teachers' & State Employees' Retirement System of North Carolina*, 345 N.C. 683 (1997), *Bailey v. State*, 348 N.C. 130 (1998), and *North Carolina Association of Educators v. State* (*NCAE*), 368 N.C. 777 (2016) (*NCAE*). According to the Retirees, these cases establish a universal framework for assessing when state employees obtain a vested right in any kind of employment benefit. According to the State, these cases explain why statutes providing *pension* benefits create vested rights; however, the State asserts that the reasons justifying this Court's treatment of pension benefits do not pertain to the kind of claimed health insurance benefits at issue here.

¶ 27        We agree with the Retirees, to an extent. Collectively, *Simpson*, *Faulkenbury*, *Bailey*, and *NCAE* establish that a state employee can obtain a vested right in an employment benefit that is not a pension and that treatment of a benefit as a contractual right does not depend on how closely that benefit resembles a pension. These cases further illustrate that the State may assume a contractual obligation to

provide a benefit even if the statute creating the benefit "did not itself create any vested contractual rights." *NCAE*, 368 N.C. at 789. Because many of the issues in this case were examined in these four prior cases, we begin with a brief review of these precedents.

### 1. *Simpson v. Local Government Employees' Retirement System.*

¶ 28      In *Simpson*, two firefighters who were vested members of the North Carolina Local Governmental Employees' Retirement System challenged a law modifying how disability retirement benefits were calculated. 88 N.C. App. at 219–21. As a result of the General Assembly's actions, the firefighters would "receive, upon disablement after vesting, a smaller retirement allowance under the modified statute than under prior law." *Id.* at 220. The firefighters claimed that the decrease "constitute[d] an impairment of contractual rights" in violation of the Contracts Clause of the United States Constitution. *Id.* at 221. The Court of Appeals agreed, and this Court affirmed per curiam.

¶ 29      According to the Court of Appeals, "the relationship between plaintiffs and the Retirement System is one of contract." *Id.* at 223. In support of this holding, the Court of Appeals identified two related but distinct justifications for characterizing the plaintiffs' disability benefits as vested contractual rights:

> If a pension is but deferred compensation, already in effect earned, merely transubstantiated over time into a retirement allowance, then an employee has contractual rights to it. *The agreement to defer the compensation is the*

> *contract. Fundamental fairness also dictates this result.* A
> public employee has a right to expect that the retirement
> rights bargained for in exchange for his loyalty and
> continued services, and continually promised him over
> many years, will not be removed or diminished.

*Id.* at 223–24 (emphasis added). The firefighters had vested rights in their pension benefits because (1) they earned the benefits as compensation while they were working and deferred receipt until retirement, and (2) the promise of disability retirement benefits allocated in a particular way was part of the bargain they struck with the State when they entered into an employment contract. *Id.* Notably, the Court of Appeals pointedly rejected the State's argument that the General Assembly's inclusion of a "right-to-amend" clause in the statute providing benefits to the firefighters defeated the firefighters' claim.[5] *Id.* at 221.

¶ 30     Next, without analysis, the Court of Appeals concluded that the challenged law substantially impaired the firefighters' vested rights "inasmuch as plaintiffs stand to suffer significant reductions in their retirement allowances as a result of the legislative amendment under challenge." *Id.* at 225. But the Court of Appeals concluded that a "genuine issue[ ] [remained] as to a[ ] material fact in this action," namely, whether the State had demonstrated that the legislative changes to the

---

[5] For reasons explained more fully below, given the fact that *Simpson* established that a statutory provision containing a right-to-amend clause could give rise to contractual benefits, it was not unreasonable for the Retirees to believe that the statutory provisions granting retirement health insurance coverage could give rise to contractual benefits notwithstanding the legislature's inclusion of a right-to-amend clause.

retirement plan were "reasonable *and necessary* to serve an important state interest." *Id.* at 226. Accordingly, the Court of Appeals held that summary judgment for the State had been "improvidently entered" and remanded the case to the trial court for further proceedings. *Id.*

### 2. *Faulkenbury v. Teachers' & State Employees' Retirement System of North Carolina.*

In *Faulkenbury* we considered whether a statute "which reduced plaintiffs' disability retirement payments[ ] violates Article I, Section 10 of the Constitution of the United States." 345 N.C. at 690. Noting that the case was "almost on all fours with" *Simpson*, we affirmed "that the relation between the employees and the governmental units was contractual." *Id.* Because "[a]t the time the plaintiffs' rights to pensions became vested, the law provided that they would have disability retirement benefits calculated in a certain way," we concluded that "[t]hese were rights [the plaintiffs] had earned and that may not be taken from them by legislative action." *Id.*

After declining the defendants' invitation to overrule *Simpson*, we considered and rejected various arguments purporting to explain why the plaintiffs lacked a contractual right in disability benefits calculated in the manner provided at the time their benefits vested. We expressly rejected the argument that the plaintiffs' rights were not contractual because "the statutes upon which the plaintiffs rely . . . only state a policy which the General Assembly may change." *Id.* Instead, we concluded

that these statutes "provided what the plaintiffs' compensation in the way of retirement benefits would be" at the time the plaintiffs "started working for the state." *Id.* Thus, when the plaintiffs accepted their offers of employment and subsequently vested in the retirement system, the statutes outlining disability benefits became part of their contracts. *Id.*

¶ 33        We reached this conclusion notwithstanding our recognition that "nothing in the statutes" indicated the General Assembly "intended to offer the benefits as a part of a contract." *Id.* at 691. Instead of restricting our analysis to the four corners of the statute, we considered how a reasonable person offered employment with the State would interpret what the benefits provided by the statute represented:

> [W]hen the General Assembly enacted laws which provided for certain benefits to those persons who were to be employed by the state and local governments and who fulfilled certain conditions, this could reasonably be considered by those persons as offers by the state or local government to guarantee the benefits if those persons fulfilled the conditions. When they did so, the contract was formed.

*Id.* We concluded it was reasonable for a prospective employee to believe the statutes providing retirement disability benefits were part of the compensation package promised, even though these statutes provided that the General Assembly "reserved the right to amend the retirement plans for state and local government employees." *Id.*

¶ 34        Regarding the second prong of the *U.S. Trust* test, we reasoned that even if

other changes to the plaintiffs' overall retirement benefits meant they were "receiving more than any reasonable expectation they had for disability benefits," the plaintiffs were "entitled to what they bargained for when they accepted employment with the state and local governments. They should not be required to accept a reduction in benefits for other benefits they have received." *Id.* at 693. Regarding the third prong, we rejected the defendants' argument that the changes were "reasonable and necessary to accomplish [the] important public purpose" of discouraging employees from "tak[ing] early retirement." *Id.* at 693–94. Accordingly, we held that the statute changing how retirement benefits were calculated violated the Contracts Clause. *Id.* at 694.

### 3. *Bailey v. State.*

In *Bailey* a class of state and local government employees challenged a state law capping the amount of retirement benefits that were exempted from state taxation at $4,000. 348 N.C. at 139. Prior to the law, all benefits paid out to retirees under any state or local retirement system were entirely tax-exempt. *Id.* Every member of the class had " 'vested' in the retirement system" before the law took effect, meaning they had met "the requirement that employees work a predetermined amount of time in public service before [becoming] eligible for retirement benefits." *Id.* at 138. Ultimately, we agreed with the plaintiffs that they had "a contractual right to an exemption of their benefits from state taxation that has been impaired by the

Act." *Id.* at 139.

¶ 36 Once again, the defendants invited this Court to overrule *Simpson*. Once again, we declined. *Id.* at 142 ("[T]he contractual relationship approach taken by the Court of Appeals in *Simpson* and our subsequent decisions is the proper one."). Instead, we affirmed the underlying principle that North Carolina law has "long demonstrated a respect for the sanctity of private and public obligations from subsequent legislative infringement." *Id.* We explained that "[t]his respect for individual rights has manifested itself through the expansion of situations in which courts have held contractual relationships to exist, and in which they have held these contracts to have been impaired by subsequent state legislation." *Id.* at 143. We noted that this principle has been extended to cases protecting vested rights that were not created by statute. *Id.* at 144 (citing *Pritchard v. Elizabeth City*, 81 N.C. App. 543, *disc. rev. denied*, 318 N.C. 417 (1986)). Indeed, we explained that "[t]he basis of the contractual relationship determinations in these and related cases is the principle that where a party in entering an obligation *relies on the State*, he or she obtains vested rights that cannot be diminished by subsequent state action." *Id.* (emphasis added). The employees' "expectational interests upon which [they] have relied through their actions" in entering into and maintaining employment with the State were the source of the vested right "safeguarded by the Contract Clause protection." *Id.* at 144–45.

¶ 37 With respect to the first prong of the *U.S. Trust* test, we framed the question

as "whether the tax exemption was a condition or term included in the retirement contract." *Id.* at 146. We found dispositive the trial court's finding of fact that "[a] reasonable person would have concluded from the totality of the circumstances and communications made to plaintiff class members that the tax exemption was a term of the retirement benefits offered in exchange for public service to state and local governments." *Id.* Moreover, we concluded that this finding was amply supported by the evidence produced at trial, including the

> creation of various statutory tax exemptions by the legislature, the location of those provisions alongside the other statutorily created benefit terms instead of within the general income tax code, the frequency of governmental contract making, communication of the exemption by governmental agents in both written and oral form, use of the exemption as inducement for employment, mandatory participation, reduction of periodic wages by contribution amount (evidencing compensation), loss of interest for those not vesting, establishment of a set time period for vesting, and the reliance of employees upon retirement compensation in exchange for their services.

*Id.* Based on this finding and the supporting evidence, we concluded that "in exchange for the inducement to and retention in employment, the State agreed to exempt from state taxation benefits derived from employees' retirement plans." *Id.* at 150. This was a sufficient basis for us to hold that "the right to benefits exempt from state taxation is a term of [every eligible State employee's] contract" with the State. *Id.*

After rejecting the defendants' arguments that other statutes and constitutional provisions forbade the State from entering into a contract to provide a

tax exemption, we held that the plaintiffs had also satisfied the second and third prongs of the *U.S. Trust* test. With respect to the second prong, we concluded that the imposition of a $4,000 annual exemption cap—which would produce "losses to retirees in expected income . . . in excess of $100 million"—was a substantial impairment of the employees' contractual right to tax-exempt retirement benefits. *Id.* at 151. With respect to the third prong, we rejected the State's effort to justify the $4,000 cap as a "reasonable and necessary" means to equalize the tax treatment of state and federal retirement benefits, as was required under a recent United States Supreme Court decision. *Id.* at 152 (citing *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803 (1989)). We held that the $4,000 cap "was not *necessary* to achieve the state interest asserted" because the State could have equalized the tax treatment of state and federal retirement benefits in "numerous ways . . . without impairing the contractual obligations of plaintiffs." *Id.* (emphasis added). We held that the impairment was "not *reasonable* under the circumstances" merely because the impairment would allow the General Assembly to comply with *Davis* by enacting "revenue neutral" legislation. *Id.* (emphasis added). Accordingly, we concluded that the law capping state retirement benefits tax exemptions for the plaintiffs violated the Contracts Clause of the United States Constitution and was an impermissible taking under the Law of the Land Clause of the North Carolina Constitution.

### 4. *North Carolina Association of Educators v. State.*

¶ 39        Finally, in *NCAE* a class of North Carolina public school teachers claimed that the General Assembly violated both the Contracts Clause and the Law of the Land Clause when it enacted a statute eliminating North Carolina's career status system, "creat[ing] a new system of employment," and "retroactively revok[ing] the career status of teachers who had already earned that designation." 368 N.C. at 779. Under the career status system, teachers who had been employed for a statutorily fixed number of years became eligible to enter into a "career teacher" contract with the teacher's local school board; having attained career status, the teacher would "no longer [be] subject to an annual appointment process and could only be dismissed for . . . grounds specified [by] statute." *Id.* (internal citation omitted). This Court concluded that the law eliminating career status was unconstitutional "to the extent that the Act retroactively applies to teachers who had attained career status as of" the date the change took effect. *Id.*

¶ 40        Once again, the Court turned to the three-prong *U.S. Trust* test. To determine if the State had undertaken a contractual obligation to maintain the career status system, the Court first considered "whether any contractual obligation arose from the statute making up the now-repealed Career Status Law." *Id.* at 786. Noting the "presumption" against construing state statutes to create private contractual or vested rights, *id.*, the Court concluded that the law itself was not the source of any

such rights, *id.* at 788. In reaching this conclusion, the Court found it "critical" that the legislature had chosen not to use the word contract in the Career Status Law. *Id.* at 787.

¶ 41    Nonetheless, the Court explained that there were other ways to prove the existence of a vested right. The first was through a statute providing benefits in the form of deferred compensation. In these circumstances "vested contractual rights were created by the statutes at issue because, at the moment the plaintiffs fulfilled the conditions set out in the two benefits programs, the plaintiffs earned those benefits." *Id.* at 788. This scenario did not describe the statutes creating the career status system because teachers who met the eligibility requirements for becoming a career teacher did not automatically become a career teacher; rather, they needed to "enter a career contract with the school board." *Id.* Accordingly, the Court held that "the Career Status Law did not itself create any vested contractual rights." *Id.* at 789.

¶ 42    Yet the Court's analysis "d[id] not end here." *Id.* Instead, the Court explained that "[l]aws which subsist at the time and place of the making of a contract . . . enter into and form a part of it, as if they were expressly referred to or incorporated in its terms." *Id.* at 789 (second alteration in original) (quoting *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 429–30 (1934)). When teachers entered into contracts with local school boards to become career teachers, the "statutory system that was in the background of the contract between the teacher and the board set out the mechanism

through which the teachers could obtain career status." *Id.* After the teacher "complet[ed] several consecutive years as a probationary teacher and then receiv[ed] approval from the school board," the teacher's contractual right to career status protections "vested." *Id.* "At that point, the General Assembly no longer could take away that vested right retroactively in a way that would substantially impair it." *Id.* Thus, we concluded that "vesting stems not from the Career Status Law, but from the teacher's entry into an individual contract with the local school system." *Id.*

¶ 43     In support of this conclusion, the Court relied on evidence in the record indicating that the opportunity to attain career status was offered to teachers as part of the compensation package used to attract them to public sector employment and that teachers considered the benefit to be an important incentive to remain in their positions. *Id.* (stating that the record "demonstrates the importance of those protections to the parties and the teachers' reliance upon those benefits in deciding to take employment as a public school teacher"). Relying principally on affidavits submitted by the plaintiffs, the Court explained that public school teachers

> were promised career status protections in exchange for
> meeting the requirements of the law, relied on this promise
> in exchange for accepting their teacher positions and
> continuing their employment with their school districts,
> and consider the benefits and protections of career status
> to offset the low wages of public school teachers.

*Id.* at 789–90. Thus, "although the Career Status Law itself created no vested contractual rights, the contracts between the local school boards and teachers with

approved career status included the Career Status Law as an implied term upon which teachers relied." *Id.* at 790.

¶ 44      The Court then examined the two remaining prongs of the *U.S. Trust* test. Because the law repealing career status eliminated protections that had previously been afforded to the teachers under the Career Status Law, the Court had no trouble concluding that repeal of the law effected "a substantial impairment of the bargained-for benefit promised to the teachers who have already achieved career status." *Id.* Addressing the third prong—whether the impairment was "reasonable and necessary"—the Court explained that the burden shifted back to the State to "justify an otherwise unconstitutional impairment of contract" in light of "the interest the State argues is furthered." *Id.* at 791. Although the Court agreed with the State that "maintaining the quality of the public school system is an important purpose . . . [and] that alleviating difficulties in dismissing ineffective teachers might be a legitimate end justifying changes to the Career Status Law, no evidence indicates that such a problem existed." *Id.* Furthermore, the Court could not discern how retroactively repealing career status for all teachers who had already earned it was a "reasonable" way of advancing the State's asserted interest in light of "several alternatives . . . that would allow school boards more flexibility in dismissing low-quality teachers." *Id.* at 792. Accordingly, the Court held that the repeal of the Career Status Law was unconstitutional as applied to teachers who had entered into contracts with school

boards which granted them career status protections. *Id.*

**B. Whether a contractual obligation is present.**

¶ 45        The facts regarding the language chosen by the General Assembly in the statutes creating the State Health Plan, and the language regarding the plan utilized by the State and its agents in communications with employees, retirees, and the public, are not in dispute. The sole question before us in resolving this issue is a legal one: the facts being what they are, do state employees have a vested right in lifetime enrollment in a premium-free health insurance plan offering coverage that is of equivalent or greater value than the plan offered at the time they became eligible to enroll in the State Health Plan on a noncontributory basis? We conclude that they do.

¶ 46        As our precedents illustrate, a state employee can prove the existence of a vested right in numerous ways. An employee can show that the statute conferring a benefit is itself the source of the right. Generally, proving that the statute is itself the source of a right requires an employee to point to language in the statute plainly evincing the General Assembly's intent to undertake a contractual obligation. Based on the uncontested facts, we agree with the State that the Establishing Act is not itself the source of the Retirees' contractual right. The Establishing Act declares that the State "undertakes to *make available* a Comprehensive Major Medical Plan . . . to employees, retired employees, and certain of their dependents," but it stipulates that the State "will pay benefits *in accordance with the terms hereof.*" Act of June 23, 1982,

ch. 1398 § 6, 1981 N.C. Sess. Laws (Reg. Sess. 1982) at 292 (emphases added) (enacting N.C.G.S. § 135-40 (1982), repealed by S.L. 2008-168 § 3(b), 2007 N.C. Sess. Laws. (Reg. Sess. 2008) 649, 661)). In addition, the Establishing Act contains a "right-to-amend" clause which expressly reserves to the General Assembly the authority to change the "terms" of coverage. *Id.* Accordingly, the Establishing Act does not expressly indicate an intent to create a contractual obligation to provide health insurance coverage of a certain value.

¶ 47      But state employees can also prove the existence of a vested right by demonstrating that they reasonably relied upon the promise of benefits provided by a statute when entering into an employment contract with the State. *See, e.g., Bailey*, 348 N.C. at 145. If a statute provides benefits in the form of immediate compensation deferred until retirement, then the employee's right to the benefit vests when the contract is formed. *Cf. NCAE*, 368 N.C. at 788 ("Though the benefits would be received at a later time, the plaintiffs' right to receive them accrued immediately, became vested, and a contract was formed between the plaintiffs and the State." (citing *Bailey* and *Faulkenbury*)). By contrast, if a statute provides benefits for which an employee only becomes eligible after certain conditions are met, then the employee's right to the benefit vests when he or she satisfies the relevant eligibility criteria. *Id.* at 788–89.

¶ 48      The Court of Appeals went awry in three important ways when interpreting

and applying our Contracts Clause precedents. First, as detailed above, the Court of Appeals ignored our cases recognizing that vested rights can arise even in the absence of a statute demonstrating the General Assembly's express intent to undertake a contractual obligation. As *NCAE* illustrates, vested rights may arise from a source other than an express statutory provision even in circumstances involving benefits that are not pensions. Second, the Court of Appeals overstated the importance of the distinction between pension benefits and other kinds of retirement benefits. Although it is relevant that some of the factors which have led this Court to recognize pension benefits as vested rights are not present with regard to lifetime enrollment in a premium-free health insurance plan, these distinctions do not preclude a finding that public employees obtained a vested right to the latter.[6] Third, the Court of Appeals was wrong to disregard the Retirees' extrinsic evidence regarding the State's communications about the health insurance benefit and what employees reasonably understood that benefit to be. On a different set of facts in which a statute providing benefits unambiguously disclaimed any intent to provide any benefits that could be

---

[6] For example, it is correct that public employees are required to contribute to and enroll in the pension system but that they can opt out of health insurance coverage. Regardless, even if an employee does not choose to enroll in the State Health Plan, the availability of such a plan to an employee—and the employee's lifetime eligibility to become a plan member—confers a material benefit which could reasonably influence an individual's decision to accept or remain in employment with the State.

incorporated into the terms of a contract,[7] the importance of the State's subsequent communications with employees might be diminished. But we are not presented with such a circumstance in this case.

¶ 49    Here, the undisputed evidence establishes that, as the trial court found, "[t]he [State] offered [the Retirees] certain premium-free health insurance benefits in their retirement if they worked for the State . . . for a requisite period of time" and that the "promise" of this benefit was "part of the overall compensation package" state employees reasonably expected to receive in return for their services. The undisputed evidence

> reveals that often the [benefit of lifetime eligibility for premium-free health insurance] was communicated to prospective employees with the intent of inducing individuals to either begin or continue public service employment. Moreover, . . . innumerable communications were made to plaintiff public employees throughout their careers, both orally and in writing (including multiple unequivocal written statements in official publications and

---

[7] Notably, the General Assembly has enacted statutes containing right-to-amend provisions which explicitly and unmistakably stated that any benefits provided by statute would not be contractual in nature. *See* N.C.G.S. § 135-113 (2021) ("The benefits provided in this Article as applicable to a participant who is not a beneficiary under the provisions of this Article *shall not be considered as a part of an employment contract, either written or implied*, and the General Assembly reserves the right at any time and from time to time to modify, amend in whole or in part or repeal the provisions of this Article."); *see also* N.C.G.S. § 128-38.10(j) (2021) ("The General Assembly reserves the right at any time and, from time to time, to modify or amend, in whole or in part, any or all of the provisions of the QEBA. No member of the Retirement System and no beneficiary of such a member shall be deemed to have acquired any vested right to a supplemental payment under this section."). The fact that the legislature chose *not* to include this kind of explicit clause in the right-to-amend provision at issue here is further support for the conclusion that the Retirees reasonably relied on the State's promise of retirement health insurance coverage.

employee handbooks) [regarding the availability of the benefit]. . . .

*Bailey*, 348 N.C. at 138. The undisputed evidence demonstrates that this benefit was an important component of state employees' acceptance of and continuation in employment with the State. *NCAE*, 368 N.C. at 789. These undisputed facts are sufficient to establish the legal proposition that a vested right arose from employees' reasonable "expectational interests" and their actions in reliance thereon. *Bailey*, 348 N.C. at 145.

¶ 50     For example, multiple class members testified to the impact the promise of retirement health insurance coverage had on their decision to accept employment with and continue working for the State. As we explained in *NCAE*, such evidence can "demonstrate[ ] the importance of those protections to the parties and the [employees'] reliance upon those benefits in deciding to take [public] employment." 368 N.C. at 789. The State does not meaningfully dispute the fact that class members understood the promise of eligibility to enroll in health care after retirement to be a benefit they earned through their service to the State—indeed, multiple of the defendants or their agents agreed in deposition testimony that they understood themselves to have "*vested* in the retiree health benefit." This undisputed evidence establishes that the promise of health insurance coverage in retirement was "an implied term upon which [the employees] relied." *Id.* at 790.

¶ 51     Of course, one party's reliance does not give rise to a contractual obligation if

their reliance is unreasonable. But, in this case, undisputed evidence illustrates that all parties understood the State to have undertaken an obligation to provide continued premium-free health insurance coverage to retirees who had satisfied the statutory eligibility requirements.[8] While this evidence does not prove that the General Assembly acted with an express intent to contract, it demonstrates the reasonableness of the Retirees' belief that lifetime eligibility for enrollment in a premium-free health insurance plan was an inducement to employment and a part of their overall compensation package.

The short title of the final version of the 2006 bill requiring retired employees to have worked for the State for at least twenty years before becoming eligible for noncontributory retirement health insurance benefits was "State Health Plan / 20-Year *Vesting*." S.837 (3d ed.), S.L. 2006-174, § 1, 2005 N.C. Sess. Laws (Reg. Sess. 2006) at 630 (emphasis added). An actuarial study commissioned by the General Assembly to analyze the fiscal impact of changing the service requirement stated that

---

[8] Although the question of whether a party's reliance is reasonable "is ordinarily a question of fact," *Olivetti Corp. v. Ames Bus. Sys., Inc.*, 319 N.C. 534, 544 (1987), the question of whether there exists a "*genuine* issue of material fact" with respect to the reasonableness of a party's reliance is a "question[ ] of law," *Ellis v. Williams*, 319 N.C. 413, 415 (1987) (emphasis added). Thus, we have on numerous prior occasions recognized that the question of whether a party's reliance has been "established as a matter of law" to be reasonable can be resolved on a party's appeal from a summary judgment order when the underlying material facts are undisputed. *Cummings v. Carroll*, 866 S.E.2d 675, 2021-NCSC-147, ¶ 38; *see also Ussery v. Branch Banking & Tr. Co.*, 368 N.C. 325, 336 (2015) (concluding on review of summary judgment order that debtor "cannot . . . claim he reasonably relied on" creditor's representation, and citing Court of Appeals decision for proposition that a party's reliance can be "unreasonable as a matter of law").

"current non-contributory premiums paid on behalf of current retirees . . . *will continue to be a State obligation for some time until these retirees exit the Plan.*" Staff of N.C. Gen. Assembly Fiscal Rsch. Div., *Legislative Actuarial Note on S. 837 (2d ed.): State Health Plan / 20-Year Vesting*, 2005 Sess. (Reg. Sess. 2006) (June 30, 2006) at 3 (emphasis added). The fiscal note further explained that the bill increasing the minimum number of years of service "*requires its application to be prospective*" and reiterated that the State would still have an "obligation" to pay the premiums of retirees and current employees who had already vested. *Id.* (emphasis added). This legislative history, including the General Assembly's frequent use of the terms "vested" and "obligation" in reference to its future payment of retirees' health insurance premiums, is further support for the proposition that the Retirees have demonstrated that they and the State shared a common understanding of what this benefit represented.

¶ 53      Indeed, on numerous occasions, State officials and agents involved in administering retirement benefits told State employees they could rely on the promise of health insurance coverage in retirement. In press releases, benefits booklets, and training materials, the State conveyed to its employees that after completing the applicable service eligibility requirements they would be entitled to health insurance coverage "for life." Customer service personnel were instructed that "[i]n order for the retiree to have paid health insurance, he [or she] must have 5 years

of contributing membership in the State System, and be in receipt of a monthly retirement benefit with the State. . . . With growing concern about health insurance in our society today, this is an important piece of information that the member should know if he [or she] is vested . . . ." Again, the State does not dispute the existence of these materials or the words they contained. As this evidence makes clear, the State believed it had undertaken an ongoing commitment to provide health insurance benefits to retired employees who had satisfied eligibility requirements and, frequently and in numerous ways, communicated that fact to its employees; it is not unreasonable for these employees to have taken the State at its word.

¶ 54    For years, employees entering into public employment "relie[d] on" the State's promise of future health insurance benefits. *Bailey*, 348 N.C. at 144. Prior cases recognizing that this kind of reliance gives rise to vested rights are, like this case, "rooted in the protection of expectational interests upon which individuals have relied through their actions." *Id.* at 145. "The statutory system that was in the background of the contract between" the Retirees and the State "set out the mechanism through which the [employees] could obtain" the health insurance benefit. *NCAE*, 368 N.C. at 789. Once state employees met the applicable statutory eligibility requirements and became eligible to enroll in a noncontributory health insurance plan, their right vested to enroll in a plan offering equivalent or greater value to the one offered to them at the time the contract was formed. Accordingly, we overrule the Court of

Appeals' determination that the Retirees had failed to prove the existence of a vested right subject to protection by the Contracts Clause.

**C. Whether the contract was substantially impaired.**

¶ 55 The trial court's sole legal conclusion addressing the second prong of the *U.S. Trust* test was its determination that "[t]he [State] substantially impaired the contracts with the [Retirees]." The Court of Appeals did not reach this prong because it held that the Retirees possessed no vested right to health insurance benefits upon retirement which the State could unconstitutionally impair. Regardless, in reviewing the trial court's order resolving the parties' competing motions for summary judgment, we review de novo the trial court's findings of fact and conclusions of law addressing this issue. *Forbis*, 361 N.C. at 523–24.

¶ 56 At the outset, we reject the State's argument that the existence of the right-to-amend provision in the Establishing Act automatically negates the Retirees' argument that the 2011 Act substantially impaired their vested rights. This argument suggests that because the General Assembly reserved the right to make (and regularly has made) changes to the terms of the health insurance plans available to retirees, any such changes are necessarily consistent with the Retirees' "objectively reasonable reliance interests." The absurdity of this argument is apparent if taken to its logical conclusion. Under the State's reasoning, the General Assembly would not substantially impair the Retirees' vested rights as long as the legislature continued

offering a premium-free 80/20 PPO Plan, even if the State imposed a $1 million copay for covered services or a similarly exorbitant deductible. Yet obviously, under these circumstances the Retirees would rightly perceive that they were being denied the benefit of their bargain. Their vested right is more than just the right to enroll in *a* health insurance plan: this right has a substantive component relating to the value of the plans being offered by the State.

¶ 57     Nonetheless, recognizing that the Retirees' vested rights have a substantive component does not resolve whether those rights were substantially impaired. To answer that question, the Retirees needed to (1) demonstrate a method for objectively determining the value of a health insurance plan, one that accounted for the numerous variables influencing the "value" of a health insurance plan to a plan member; (2) establish the baseline value of the health insurance plan offered to each Retiree when his or her right to retirement health insurance benefits vested; and (3) show that the plans currently offered by the State are substantially less valuable than those baseline plans. We agree with the State that the trial court erred in resolving these issues on summary judgment.

¶ 58     The trial court entered three findings of fact of particular relevance to its conclusion that the 2011 Act substantially impaired the Retirees' vested rights:

> 27. The currently offered 80/20 "Enhanced" Plan (formerly called the standard plan) [i.e., the 80/20 PPO Plan] was the continuation of the primary "regular state health plan" [i.e., the Major Medical Plan] that had been

offered premium-free from 1982 until August 31, 2011.

. . . .

29. The most appropriate way to measure the value of a health plan received by a member of that plan and to compare the value between offered plans is through the calculation and use of a plan's actuarial value. Through the use of actuarial values, it can be determined whether a given plan is equivalent to another plan or not – the effective actuarial equivalency (hereinafter such calculation methodology referred to as "Equivalent").

. . . .

31. The health plan(s) offered by the State Health Plan at the 70/30 level and referred to by the State Health Plan as the "Basic" and "Traditional" Plans from 2011-2016 is of a lesser value than the 80/20 Standard Plan and was not and is not Equivalent to the 80/20 Standard Plan.

Contrary to the trial court's characterization of these findings as "[u]ndisputed," each was and remains vigorously contested. The State disagrees that the 80/20 PPO Plan is the continuation of the Major Medical Plan, disputes the validity of the "actuarial equivalency" method for determining the relative value of different health insurance plans, and asserts that "the State has always offered plaintiffs a health plan with an actuarial value" "that mirrors the Major Medical Plan." There is evidence in the record to support both parties' positions on each of these determinative issues.

¶ 59 The "facts alleged" by the State "are of such nature as to affect the result of the action," and "question[s] as to . . . the weight of evidence" have been brought forth by

the parties. *Kessing v. Nat'l Mortg. Corp.*, 278 N.C. 523, 535 (1971). For example, the State argued at summary judgment that the evidence showed that "over 75% of retirees who are enrolled in the State Health Plan are eligible for Medicare" and that for those individuals, the cost difference between the 70/30 and 80/20 PPO Plans is just "slightly over $3 per month." Thus, the State contends that even after 2011 the Retirees could remain in a premium-free health insurance plan providing essentially the same or greater value as the plan offered to them when their rights vested. The State also presented evidence disputing the Retirees' assertion that a sizeable portion of the class was paying premiums as high as $100 per month to maintain their coverage.

¶ 60       At the same time, the Retirees have offered evidence that supports the conclusion that their rights were substantially impaired, including that the plans currently offered cost members, on average, an additional $400 per year, and that the total impairment to the Retirees' contractual rights may exceed $100 million in back premiums. Thus, there are "genuine issues [of] . . . material fact" with respect to the second prong of the *U.S. Trust* test, and these issues are "triable." *N.C Nat'l Bank v. Gillespie*, 291 N.C. 303, 310 (1976). Although some of the material evidence is undisputed, the parties do not agree on the central questions of how to value health insurance plans and whether the health insurance plans offered to retirees after the effective date of the 2011 Act are comparable to or of substantially lesser value than

the plans they bargained for. Accordingly, "summary judgment was improperly granted." *N.C. Farm Bureau Mut. Ins. Co. v. Sadler*, 365 N.C. 178, 182 (2011).

¶ 61 Moreover, we note that even if the trial court's findings had been undisputed, the findings would be inadequate to support the conclusion that there was a substantial impairment. The trial court largely based its conclusion that the State substantially impaired class members' contracts on its finding that "[t]he health plan[s] offered by the State Health Plan at the 70/30 level . . . is of a lesser value than the 80/20 Standard Plan and was not and is not Equivalent to the 80/20 Standard Plan." But, in addition to finding that the value of a vested right has been diminished, the trial court also needed to determine the magnitude of the decline in value in order to ascertain whether any impairment was "substantial." As we explained in *Bailey*, "[w]hen examining whether a contract has been unconstitutionally impaired, the 'inquiry must be whether the state law has, in fact, operated as a substantial impairment of a contractual relationship. . . . Minimal alteration of contractual obligations may end the inquiry at [this] stage.'" *Bailey,* 348 N.C. at 151 (alterations in original) (quoting *Allied Structural Steel Co.*, 438 U.S. at 244–45 (footnote omitted)).[9] Given the complexities inherent in determining the comparative value of

---

[9] In assessing whether an impairment is minimal or substantial, courts may consider the "overall impact" of the impairment when measured in the aggregate provided they do so in the context of the size of the class. *Bailey v. State*, 348 N.C. 130 (1998). For example, the $100 million impairment at issue in *Bailey* would likely not have established the existence of a "substantial" impairment if the class had been comprised of one hundred million people.

different health insurance plans, it was not self-evident that eliminating the premium-free 80/20 PPO Plan while maintaining the premium-free 70/30 PPO Plan worked a substantial impairment.

¶ 62        Further, the parties agreed to defer consideration of the extent of damages, but that evidence may be relevant to whether the contractual impairment was substantial. Different class members vested at different times, and the terms of the Major Medical Plan and the PPO plans the State began offering later have changed over time. These evolutions matter in the Contracts Clause analysis—the terms of the plan offered when each class member vested establish the baseline value of what each individual bargained for. Yet the trial court's findings do not address these nuances, and the evidence at summary judgment indicates that the value of the benefits the Retirees could expect at the time they vested remains hotly contested. It may be that the Retirees can obviate the need to engage with these complexities by proving that all of the noncontributory plans offered to class members who vested before 2011 were more valuable than any of the noncontributory plans offered to class members today—or, vice versa, that the State can prevail by proving that the value of a noncontributory plan offered to every class member today is equivalent to or more generous than the most valuable noncontributory plan available to all class members when they vested. But neither side has met its burden of doing so on summary judgment. This information is actually disputed and is crucial to measuring whether

there was an impairment and, if so, whether the impairment was substantial.

¶ 63     The trial court's determination that there was a substantial impairment of the Retirees' contracts was based on an overly simplified characterization of what the Retirees were entitled to when they vested and what they were receiving after the 2011 Act took effect. The trial court's order masks important disputes of material fact that must be resolved before a decision on liability can be made. In *Simpson* this Court held that the plaintiffs "had a contractual right to rely on the terms of the retirement plan as these terms existed at the moment their retirement rights became vested." 88 N.C. App. at 224. In *Faulkenbury*, we explained further that the plaintiffs "expected to receive what they were promised at the time of vesting. They may not have known the exact amount, but this was their expectation. The contract was substantially impaired when the promised amount was taken from them." 345 N.C. at 692–93. Therefore, the crucial factual matters relevant to this issue are the value of the plan in which the Retirees were vested and the value of what was offered to them after the 2011 Act took effect. While it is understandable that the parties and the trial court were not eager to wrestle with the factually complex assessment of which class members suffered what damages, in this case that assessment of damages may be crucial to determining whether, in fact, the impairment of the state employees' contract was substantial and thus constitutionally salient.

**D. Whether the impairment was reasonable and necessary.**

¶ 64     If the trial court determines that the 2011 Act substantially impaired the Retirees' contractual rights, the final question is whether the impairment was "a reasonable and necessary means of serving a legitimate public purpose." *NCAE*, 368 N.C. at 791. "This portion of the inquiry involves a two-step process, first identifying the actual harm the state seeks to cure, then considering whether the remedial measure adopted by the state is both a reasonable and necessary means of addressing that purpose." *Id.* (citing *Energy Rsrvs. Grp. v. Kan. Power & Light Co.*, 459 U.S. 400, 412 (1983)). At this stage of the analysis, "[t]he burden is upon the State . . . to justify an otherwise unconstitutional impairment of contract." *Id.* (citing *U.S. Trust*, 431 U.S. at 31).

¶ 65     In its order granting the Retirees' partial motion for summary judgment, the trial court found that the State's impairment "was neither reasonable nor necessary to serve an important public purpose." However, underlying this determination are genuine disputes about material facts which require further development at trial. In particular, should it need to reach this question on remand, the trial court must closely examine the State's asserted interest in avoiding an "estimated thirty-five billion dollars in unfunded future outlays" and the Retirees' rejoinder that "there were a multitude of methods to stabilize the State Health Plan without impairing vested rights."

Although answering this question primarily requires resolving disputed issues of fact, certain applicable legal principles can be discerned from our case law. First, the existence of the problem the State asserts it seeks to address by impairing a contract cannot be assumed. Instead, the State must present "evidence [which] indicates that such a problem existed." *Id.* Second, the State's interest in not expending resources is not, standing alone, sufficient to render an impairment reasonable. Many contracts commit a party to expending resources in the future, even if the party would prefer not to when the time comes to pay; the party's obligation to do so anyway makes it a contract. The fact that disallowing an impairment might require the General Assembly to make difficult choices regarding how to allocate resources to best manage its fiscal obligations does not necessarily justify abrogating the legislature's contractual obligations. *Bailey*, 348 N.C. at 152. Similarly, the fact that certain trends have caused an increase in the State's cost of maintaining the promised benefits does not, on its own, justify an impairment. *See Faulkenbury*, 345 N.C. at 694 ("We do not believe that because the pension plan has developed in some ways that were not anticipated when the contract was made, the state or local government is justified in abrogating it."). Finally, the State "is not free to impose a drastic impairment when an evident and more moderate course would serve its purposes equally well." *U.S. Trust*, 431 U.S. at 31. The existence of "alternative[ ]" methods of advancing the State's asserted interest other than imposing an

impairment tends to detract from the State's contention that the impairment is necessary. *NCAE*, 368 N.C. at 792. At the same time, we recognize that "the [e]conomic interest of the state may justify . . . interference with contracts," *Home Bldg. & Loan Ass'n*, 290 U.S. at 437, and that the State always retains the authority to act to protect the public should it be faced with a grievous fiscal emergency. On remand, these principles should guide the trial court's effort to ascertain whether any impairment of the Retirees' rights, if proved, was "reasonable and necessary" and thus permissible under the Contracts Clause.

## IV.    The State Law of the Land Clause Claim

¶ 67        In addition to their Contracts Clause claim, the Retirees also alleged that the 2011 Act constituted an impermissible taking of private property in violation of article I, section 19 of the North Carolina Constitution. The trial court agreed, concluding that "[i]mposing premiums on the 80/20 Standard Plan . . . constituted a 'taking' under state law of Class Members' private property by restricting and/or eliminating Class Members' contractual right to the non-contributory 80/20 Standard plan and reducing a vested retirement benefit." The Court of Appeals reversed based on its conclusion that the Retirees had failed to demonstrate the existence of any rights implicated by the 2011 Act. *Lake*, 264 N.C. App. at 188.

¶ 68        The Law of the Land Clause of the North Carolina Constitution guarantees in relevant part that "[n]o person shall be . . . in any manner deprived of his . . . property,

but by the law of the land." N.C. Const. art. I, § 19. As the Court of Appeals correctly explained, "[a] contractual right is a property right, and the impairment of a valid contract is an impermissible taking of property." *Lake*, 264 N.C. App. at 188; *see also Bailey*, 348 N.C. at 154 ("[V]alid contracts are property . . . ." (quoting *Lynch v. United States*, 292 U.S. 571, 579 (1934))). Thus, in holding that the Retirees do have a vested right in retirement health insurance coverage, we necessarily overrule the Court of Appeals' conclusion that the Retirees lack a colorable state constitutional claim. Of course, even if there is a property right, there can be no constitutionally impermissible taking if there is no taking. *Cf. Dep't of Transp. v. Adams Outdoor Advert. of Charlotte Ltd. P'ship*, 370 N.C. 101, 106 (2017) ("When the State *takes* private property . . . the owner must be justly compensated.") (cleaned up) (emphasis added). Accordingly, on remand, the trial court must reassess the Retirees' Law of the Land Clause claim in light of its resolution of the parties' dispute regarding the value of the noncontributory plans offered by the State to Retirees at various times.

## V.    Conclusion

This case raises significant questions relating to the State's efforts over the years to attract and retain talented employees while responsibly managing its fiscal obligations. This dispute also raises issues of profound importance to the hundreds of thousands of dedicated public employees who devoted their lives to serving their fellow North Carolinians, often for less immediate remuneration than would have

been available to them in the private sector. Although our decision in this case does not end this controversy, it narrows the issues and, hopefully, moves the parties closer to a just resolution.

¶ 70    Today we hold that the Retirees who satisfied the eligibility requirements existing at the time they were hired obtained a vested right in remaining eligible to enroll in a noncontributory health insurance plan for life. These Retirees reasonably relied on the promise of this benefit in choosing to accept employment with the State. They are entitled to the benefit of their bargain, which includes eligibility to enroll in a premium-free plan offering the same or greater coverage value as the one available to them when their rights vested. Nevertheless, we also hold that the trial court erred in concluding that the Retirees brought forth undisputed facts demonstrating that their vested rights were substantially impaired when the General Assembly eliminated the premium-free 80/20 PPO Plan in 2011. In particular, the trial court overlooked genuine issues of material fact regarding the proper way to assess the relative value of different health insurance plans and potential differences in the value of the bargain struck by class members whose rights vested at different times. The trial court also erred in entering summary judgment against the State on the issue of whether any such impairment was reasonable and necessary.

¶ 71    Accordingly, we overrule the portion of the Court of Appeals decision holding that the Retirees lacked any right which triggered the protections of the Contracts

Clause of the United States Constitution and the Law of the Land Clause of the North Carolina Constitution. We affirm the decision of the Court Appeals to the extent it reversed the trial court's grant of partial summary judgment in the Retirees' favor, reverse that court's decision with respect to its conclusion that the State was entitled to summary judgment on liability, and remand this action to the trial court for proceedings not inconsistent with this opinion.

AFFIRMED IN PART; REVERSED IN PART AND REMANDED.

Chief Justice NEWBY did not participate in the consideration or decision of this case.

Justice BARRINGER concurring in part and dissenting in part.

I agree with the majority that we must remand this case for factual determinations on whether the State substantially impaired a contract and whether such impairment was reasonable and necessary. However, because the evidence in the record, when viewed in the light most favorable to the State, creates a genuine issue of material fact as to whether any contractual obligation is present, we should also remand that issue to the trial court for resolution by the fact-finder. Accordingly, I respectfully concur in part and dissent in part.

## Analysis

In determining whether the State has unconstitutionally impaired a contract, North Carolina courts follow a three-part test involving "(1) whether a contractual obligation is present, (2) whether the state's actions impaired that contract, and (3) whether the impairment was reasonable and necessary to serve an important public purpose." *Bailey v. State*, 348 N.C. 130, 141 (1998). The trial court granted summary judgment in plaintiffs' favor on all three of these inquiries. The Court of Appeals reversed the trial court's grant of summary judgment, ruling in the State's favor on the first inquiry that no contractual obligation was present. *Lake v. State Health Plan for Tchrs. & State Emps.*, 264 N.C. App. 174, 188 (2019). Based on the evidence the parties have put forward, I cannot conclude that either court properly resolved, at the summary judgment stage, the issue of whether a contractual obligation was present.

## A. Standard of Review

When there is a motion for summary judgment pursuant to Rule 56, the court may consider evidence consisting of admissions in the pleadings, depositions, answers to interrogatories, affidavits, admissions on file, oral testimony, and documentary materials. . . . The motion shall be allowed and judgment entered when such evidence reveals no genuine issue as to any material fact, and when the moving party is entitled to a judgment as a matter of law.

An issue is material if the facts alleged would constitute a legal defense, or would affect the result of the action, or if its resolution would prevent the party against whom it is resolved from prevailing in the action. The issue is denominated "genuine" if it may be maintained by substantial evidence.

Summary judgment provides a drastic remedy and should be cautiously used so that no one will be deprived of a trial on a genuine, disputed issue of fact. The moving party has the burden of clearly establishing the lack of triable issue, and his papers are carefully scrutinized and those of the opposing party are indulgently regarded.

*Koontz v. City of Winston-Salem*, 280 N.C. 513, 518 (1972); *see also* N.C. R. Civ. P. 56(c).

"This Court reviews appeals from summary judgment de novo." *Ussery v. Branch Banking & Tr. Co.*, 368 N.C. 325, 334–35 (2015). "When considering a motion for summary judgment, the trial judge must view the presented evidence in a light most favorable to the nonmoving party." *Dalton v. Camp*, 353 N.C. 647, 651 (2001). "[I]f a review of the record leads the appellate court to conclude that the trial judge

was resolving material issues of fact rather than deciding whether they existed, the entry of summary judgment is held erroneous." *Alford v. Shaw*, 327 N.C. 526, 539 (1990).

**B. Whether a contractual obligation is present**

¶ 76        I agree with the majority that the statute does not expressly indicate an intent to create a contractual obligation. Yet, under our past precedent, plaintiffs can still establish that a contractual obligation is present if plaintiffs demonstrate that they reasonably relied upon the promise of retirement benefits provided by statute in entering into or continuing employment with the State. *Bailey*, 348 N.C. at 145. However, plaintiffs' reliance must have been reasonable, and reasonableness is a question of fact. *Id.* at 146; *see also Olivetti Corp. v. Ames Bus. Sys., Inc.*, 319 N.C. 534, 544 (1987) ("Ordinarily, the question of whether an actor is reasonable in relying on the representations of another is a matter for the finder of fact.").

¶ 77        As evidence of the reasonableness of their reliance, plaintiffs primarily point to booklets distributed by the North Carolina Retirement System. However, multiple booklets contained explicit disclaimers, in boldface type, on the first page that stated:

> DISCLAIMER: The availability and amount of all benefits you might be eligible to receive is governed by Retirement System law. The information provided in this handbook cannot alter, modify or otherwise change the controlling Retirement System law or other governing legal documents in any way, *nor can any right accrue to you by reason of any information provided or omission of information provided herein.* In the event of a conflict

between this information and Retirement System law, Retirement System law governs.

(Emphasis added.) Recent booklets, like the one dated 2009, described themselves as "summariz[ing] the benefits available to [employees] as a member of the retirement system, including: [b]enefits [employees] will receive at retirement once [they] meet the service and age requirements . . . .]" The 2009 booklet further explained that a public employee in North Carolina was part of a "defined benefit plan," meaning that when a public employee retired the employee's "life long benefits [we]re guaranteed and protected by the Constitution of the State of North Carolina." The booklets also indicated that after satisfying certain criteria an employee became "vested in the Retirement System," making that employee "eligible to apply to lifetime monthly retirement benefits." This emphatic language, however, was referring to Retirement System benefits in general, as opposed to the State Health Plan.

¶ 78    When discussing the State Health Plan for retirees, the booklets used different language. The booklets stated only that employees "*may* also be eligible for retiree health coverage as described on page 20." (Emphasis added.) On page 20, the booklets stated:

> When you retire, you are eligible to enroll in the State Health Plan, with the costs determined by when you began employment and which health coverage you select, if you contributed to the Teachers' and State Employees' Retirement System for at least five years . . . while employed as a teacher or State employee.

> At the time you complete your retirement application, be sure to complete an application to enroll in the retiree group of the State Health Plan.
>
> Under current law, if you were first hired prior to October 1, 2006, and retire with five or more years of State System membership service, the State will pay either all or most of the cost, depending on the plan chosen, for your individual coverage under one of the Preferred Provider Organization (PPO) plans. . . .

(Emphasis omitted.) Accordingly, the description of benefits was expressly recognized as conditional and further conditioned as representing the state of health benefits as they existed "[u]nder current law." In addition, the booklets described pensions as "continu[ing] for the rest of [one's] life" and "vested" but did not use the same language to describe health benefits.

Similarly, in older booklets, the language used to describe retirement benefits was not the same as the language used to describe retiree health insurance. The 1988 retirement booklet did not mention the State Health Plan until the very last section, labeled "Remember," which also discussed programs like Social Security and Medicare. Specifically, the booklet stated, "When you retire, if you have at least 5 years of service as a contributing teacher or State employee, you are eligible for coverage under the State's Comprehensive Major Medical Plan with the State contributing toward the cost of your coverage." (Emphasis omitted.)

Furthermore, the booklets distributed by the State Health Plan to employees explicitly stated on the first or second page that "[t]he North Carolina General

Assembly determines benefits for the State Health Plan and has the authority to change benefits." The 1983 booklet warned that "[s]ince the Plan was established by law, benefits and policies can be changed only through new legislation." The 1986 booklet cautioned that "the level of benefits and claims service have varied from time to time" and that "[g]iven the continued rise in health care costs and utilization (some 12% to 14% a year in this plan alone!) further benefit changes may be necessary." The 2004 booklet included a boldface type section which stated that the "Benefits for the North Carolina Teachers' and State Employees' Comprehensive Major Medical Plan are based upon legislation enacted by the North Carolina General Assembly." Finally, the booklets repeatedly noted that "[i]f any information in [the booklets] conflict[ed] with . . . the General Statutes . . . the General Statutes . . . w[ould] prevail."

¶ 81 As for the General Statutes, one section contains language noting that the State "undertakes to make available a State Health Plan . . . for the benefit of . . . eligible retired employees," but that statement is modified in the same sentence with a clause explaining that the plan "will pay benefits in accordance with the terms of this Article." N.C.G.S. § 135-48.2(a) (2021). The very next section of the statute contains an explicit disclaimer that the terms of the article are subject to alteration and termination, stating, "The General Assembly reserves the right to alter, amend, or repeal this Article." N.C.G.S. § 135-48.3 (2021).

¶ 82 While under our precedent the presence of a right-to-amend provision does not

necessarily prevent a contractual obligation from arising from a statute, *see Simpson v. N.C. Loc. Gov't Emps.' Ret. Sys.*, 88 N.C. App. 218, 221, 223–24 (1987), *aff'd per curiam*, 323 N.C. 362 (1988), a right-to-amend provision is relevant to the plaintiffs' reasonable reliance. As the Supreme Court of the United States has observed, reserving the "rights to repeal, alter, or amend, [an a]ct at any time" is "hardly the language of a contract." *Nat'l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 467 (1985) (cleaned up).

¶ 83   Further, not only did the General Assembly explicitly reserve the right to alter, amend, or repeal the State Health Plan, the undisputed evidence in the record reveals that the General Assembly frequently exercised this amendment power. Since the inception of the State Health Plan, the State has regularly amended it, raising coinsurance amounts from 5% to 10% to 20%, increasing the deductible from $100 to $150 to $250 to $350 to $450, and enlarging the out-of-pocket maximum from $100 to $300 to $1,000 to $1,500 to $2,000. In the twenty-nine years between 1982 and 2011, the record reflects that the General Assembly passed at least twenty-nine bills amending the State Health Plan, making almost two hundred individual changes.

¶ 84   In short, when plaintiffs' evidence is "carefully scrutinized" and the State's evidence is "indulgently regarded," *Koontz*, 280 N.C. at 518, and when all inferences are drawn in the light most favorable to the State, *Dalton*, 353 N.C. at 651, there is a genuine issue of material fact as to plaintiffs' reasonable reliance. The record does

not evidence "multiple unequivocal written statements in official publications and employee handbooks" promising plaintiffs lifetime noncontributory health insurance in exchange for their public service as state employees. *Bailey*, 348 N.C. at 138, 146. While certainly some materials supporting plaintiffs' position exist, plaintiffs must also admit the existence of other materials that directly contradict the reasonableness of their reliance. When the entirety of the record is viewed in the light most favorable to the State, the right-to-amend provision, the disclaimers in the booklets, and the constant statutory changes are substantial evidence that could support a finding that plaintiffs did not reasonably rely on a promise of health benefits provided by statute in entering into or continuing employment with the State.

¶ 85        Additionally, as part of the determination of whether a contractual obligation exists, the fact-finder must also determine what the terms of a contractual obligation produced by plaintiffs reasonable reliance would be. On appeal, the plaintiffs asked this Court to reinstate the term of the contractual obligation found by the trial court; namely, a contract for "the 80/20 'Enhanced' Plan (as offered by the State Health Plan in September 2011), or its Equivalent, premium-free to all non-Medicare-eligible Class Members for the duration of their retirements." The majority, however, now recognizes a different contractual obligation, one that requires the State to provide a health plan of "equivalent or greater value to the one offered" at the time each individual plaintiff "met the applicable statutory eligibility requirements and became

eligible to enroll in a noncontributory health insurance plan." Yet for the entirety of the State Health Plan's thirty-year existence, retirees have never received a health plan at a locked-in, unchanging value. Rather, retirees received whatever plan the State was then offering to current employees, which varied from year to year. Given this constant variance, the question of what terms would attach to a contractual obligation arising out of plaintiffs' reasonable reliance is also a genuine issue of material fact, one that the fact-finder should resolve in this case.

## Conclusion

In adherence to this Court's admonition that summary judgment should be "used cautiously . . . so that no one will be deprived of a trial on a genuine, disputed issue of fact," *Koontz*, 280 N.C. at 518, I have no choice but to conclude that this case should be remanded to the fact-finder. Based on the evidence in the record, the question of whether a contractual obligation could have arisen through plaintiffs' reasonable reliance and what terms would apply to such a contractual obligation is a genuine issue of material fact. Accordingly, I would remand that issue to the trial court for further proceedings not inconsistent with this opinion. Otherwise, I concur in the majority's opinion.

Justice BERGER joins in this concurring in part and dissenting in part opinion.